[Crim. No. 24110. Aug. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES E. McDOWELL, JR., Defendant and Appellant.

552

554

COUNSEL

Weyman I. Lundquist, under appointment by the Supreme Court, Andrea G. Asaro and Heller, Ehrman, White & McAuliffe for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Donald E. de Nicola, Gary R. Hahn and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—On November 15, 1983, an amended information was filed in the Los Angeles County Superior Court charging defendant Charles E. McDowell, Jr., with murder, attempted murder, attempted rape and burglary. (See Pen. Code, §§ 187, 261, 459, 664; all further statutory references are to this code unless otherwise indicated.) The information alleged that defendant personally used a knife in the commission of the murder. (§ 12022, subd. (b).) Two special circumstances were also alleged: felony-murder/burglary and felony-murder/rape. (§ 190.2, subd. (a)(17).) Count II, the attempted murder count, also charged that defendant personally used a knife, that he inflicted great bodily injury (§ 12022.7), and that the victim of the offense was a person over 60 years of age (§ 1203.09). The information further charged that defendant personally used a knife in connection with the attempted rape and burglary charges. The information alleged a prior conviction in Florida for lewd, lascivious and indecent assault on a child. Defendant pleaded not guilty to each count and denied the special circumstances and enhancements. After an initial denial, he admitted the prior conviction.

On August 15, 1984, a jury found defendant guilty as to each count of the information, and found the special circumstances and the enhancements to be true. On August 27, the jury selected the penalty of death. The court denied defendant's motions for new trial and for modification of the judgment and sentenced defendant to death. This appeal is automatic. (§ 1239.) As will appear, we conclude that the judgment should be affirmed in its entirety.

FACTS

On May 20, 1982, at approximately 1 p.m., defendant broke into the residence of Mr. and Mrs. Bardsley and killed their housecleaner, Mrs.

Paula Rodriguez. Defendant was armed with a knife which had a 10-inch blade. Mr. and Mrs. Sum, who lived in the house immediately to the north, heard terrible screams coming from the Bardsley residence. Mrs. Sum knew that Mrs. Rodriguez cleaned the Bardsley house on Thursdays and telephoned her to find out what was wrong. Someone answered the telephone but Mrs. Sum heard only screams; the person answering then quickly hung up the Bardsley telephone.

The Sums walked to the Bardsley residence to investigate the screams. Mr. Sum found the front door unlocked. He opened the door slightly and looked inside. He called for Mrs. Rodriguez but no one answered. Mr. Sum then opened the door wider and stepped inside. He called Mrs. Rodriguez's name again, this time a little louder, but still there was no response.

A few moments later, Mr. Sum saw and recognized defendant; he realized that defendant should not have been there. Mr. Sum tried to escape but he was not fast enough. Defendant, totally nude, rushed towards him and Mr. Sum noticed blood on defendant's body. Mr. Sum then saw defendant raise his right hand, which held the 15-inch knife, and thrust it downward. The knife slashed Mr. Sum's neck, inflicting a severe, although not fatal, wound. Mr. Sum pushed defendant on the stomach as hard as he could; defendant lost his balance and Mr. Sum ran out of the house and closed the door. He and his wife then returned to their home and telephoned the police. Defendant was thereafter seen running from the Bardsley house into the D'Crenza house next door; he was wearing only dark shorts. He was later seen walking south, away from the D'Crenza residence.

When the police arrived, they noticed that the front door to the Bardsley residence was ajar and that there was blood on it. One of the officers pushed the door open and looked inside; he was unable to see anyone so he waited for backup before entering the house. Other officers soon arrived and the Bardsley house was searched. Mrs. Rodriguez was found stabbed to death in one of the rooms. She was lying on her back; her legs were spread apart, her skirt had been lifted, and her panties were torn. Seminal fluid was found on the panties. She had been cut twice on the neck, and stabbed twice in the chest, once in the abdomen and once in the left arm. Her hands also suffered knife wounds, some as deep as the bone, which were consistent with injuries she would have received had she grabbed the knife in self-defense. The officers searched the residence, looking for other victims or suspects. Mrs. Rodriguez's infant baby was found unharmed upstairs in a stroller; no one else was in the house.

A short time later, Los Angeles Police Officer Petroski arrived. Petroski noticed blood on the sidewalk, as well as on the front door and entryway

walls of the Bardsley residence. He followed the trail of blood, which led out of the house and down the sidewalk. Petroski believed that the killer had been wounded and that the trail might lead to him. At the sidewalk, the trail of blood went in two directions, one north and one south. A fellow officer informed Petroski that the northern trail was made by blood from Mr. Sum's throat wound. Petroski therefore followed the southern trail.

The blood trail led to the front door of the D'Crenza residence. The front door was open and Petroski entered. He followed the trail to the second floor and into the kitchen. Petroski observed blood on the pantry closet and saw a blood-stained knife lying on the floor. There was also blood on the counter near the faucet and on the faucet itself.

The trail of blood then went into a living room/dining room area; Petroski observed a towel on the floor and a bloodstained roll of masking tape on the dining room table. The trail next led Petroski to a bedroom and bathroom. Bloodstained jogging shorts were lying on top of the bathroom sink and there were blood stains on the shower handles. Petroski found no one in the house.

Petroski started to leave when he noticed that there were blood stains on the stairs leading in different directions. Petroski testified that "when you walk or run and you are bleeding, blood spatters in a certain direction." He concluded that the killer must have still been bleeding when he left the house, so Petroski continued to follow the trail of blood.

The trail led to a house located approximately 850 feet south of the D'Crenza residence. Petroski observed blood on the door and on the doorbell. There were bushes near the front door which appeared to have been trampled. Petroski went through the bushes and picked up the trail of blood again. The trail ended at the edge of a driveway. Petroski continued down the driveway to the house; no one was home and it did not appear that the house had been entered. He therefore returned to the spot where the blood trail ended and bent down to circle the blood spatter with chalk. While Petroski was bent down, he heard a male voice say, "Don't shoot me. Don't shoot me. I give up."

Petroski drew his revolver. He determined that the voice was coming from some nearby bushes. He ordered defendant to come out but defendant responded that he was stuck. Petroski told defendant to extend his hands so that they were in plain view and called for assistance. Two officers arrived and pulled defendant out of the bushes. One of defendant's wrists was cut and the fingers on one of his hands were bleeding. He was transported to a hospital for medical treatment.

While en route to the hospital, and during his stay at the hospital, defendant made several statements to an officer assigned to watch him. He told the officer that the day before Mrs. Rodriguez's murder he had been watching a television program about a crime involving the strangulation, rape and stabbing of a woman. Defendant told the officer that he "felt a force" come over him as he watched the movie and that the program made him decide to go next door and "hurt" the woman there. He said that he did not mean to hurt her but that he could not control himself.

Later, when a technician visited defendant to test bloodstains found on his body, defendant stated, "The blood on my hands is my own. The blood from the girl will be on my stomach and pants." He also explained that he killed Mrs. Rodriguez because "he had worked on the [D'Crenza] house all day . . . [and when Mr. D'Crenza] came home, [he] didn't appreciate the work [I] had done, and that's why [I] . . . hurt the girl."

The evidence against defendant was, in the trial court's words, "overwhelming." In addition to the sequence of events described above, defendant's palm print, lifted from a telephone receiver which was covered with blood, was found inside the Bardsley home. Mr. Sum, who knew defendant before Mrs. Rodriguez's murder, positively identified defendant as the naked, bloody man inside the Bardsley residence who had stabbed him with a knife. Another witness saw defendant leave the Bardsley residence and enter the D'Crenza residence where defendant resided. Still another witness noticed defendant walking down the street, away from the D'Crenza house, a short time later. The trail of blood led from the scene to defendant, who readily admitted killing Mrs. Rodriguez.

Apart from defendant's statement that he "felt a force," no evidence was presented to show that he did not act deliberately and with premeditation, and no credible evidence of diminished capacity was offered. During closing argument at the guilt phase, defense counsel conceded that defendant was probably guilty of murder, attempted murder, burglary, and attempted rape. Counsel insisted, however, that there was no evidence that defendant intended to kill Mrs. Rodriguez, and argued that defendant went to the Bardsleys' house with only the intent to rape her. Counsel then urged the jury to find untrue the special circumstances allegations.

A jury found defendant guilty of murdering Mrs. Rodriguez with a knife while in the commission of a burglary and the attempted commission of a rape. The jury found the special circumstance allegations true, specifically finding that at the time of the killing defendant harbored an intent to kill Mrs. Rodriguez. The jury also found defendant guilty of attempting to murder Mr. Sum, and found the use and great bodily injury allegations to

be true. Finally, the jury found defendant guilty of attempted rape and burglary, and found the use allegations in each such count to be true.

At the penalty phase, the prosecution introduced evidence of two prior crimes. One of the crimes involved acts of oral copulation and sodomy committed against Curtis M., a four-year-old boy. The other crime involved the rape, sodomy, and oral copulation of Patricia H. Both of these crimes were committed in Florida.

The defense at the penalty phase consisted mainly of family members who testified that defendant's father, a "religious fanatic," had a terrible temper and beat him during much of his childhood. In addition, defendant's father had an incestuous relationship with one of defendant's sisters, and blamed defendant for the death of another sister who was struck by an automobile. Another defense witness, who was a neighbor of defendant's family when defendant was a child, testified that defendant's father was overly strict with his children.

The defense also presented the testimony of a registered nurse who was defendant's primary therapist while he was in a mentally disordered sex offender (MDSO) program in Florida. She testified that defendant was adjudged an MDSO following the Curtis M. incident (in which he pleaded guilty to a lesser offense) and that, while under her supervision, he "seemed sincere about wanting some help." Defendant's probation officer following that incident testified that she believed defendant benefited from the treatment he received at the MDSO program.

Following the penalty trial, the jury imposed the penalty of death. The court denied motions for new trial and for modification of the verdict and sentenced defendant to death. In so ruling the court stated: "This man is a danger to society. He is vicious and he will prey on anybody who is weaker than he is. He has demonstrated that he will kill. He has killed, has attempted to kill another person and would have killed at least two more people had they resisted his desires."

## I. GUILT PHASE

Defendant raises only four claims of error in connection with the guilt phase of his trial. We conclude that none of them has merit.

### A. *Representative Jury*

Defendant asserts that he was denied his right to a representative jury because certain prospective jurors were excused on *Witherspoon* grounds.

(*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) Defendant acknowledges that the United States Supreme Court has rejected a similar claim in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758], but urges us to hold otherwise. In *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680], we rejected the argument, and we see no reason to reconsider our holding. (See also *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127].)

B. *Motion to Suppress Evidence*

Before Officer Petroski arrived at the murder scene, officers had searched the D'Crenza residence for a possible suspect but none was found. (Although the officers were unaware of it, defendant lived there.) The officers proceeded to secure the house and informed other officers that the suspect had fled in an unknown direction. ■ Defendant does not appear to challenge the legality of this initial search, which was proper under the hot pursuit exception to the Fourth Amendment's warrant requirement. (See *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642].)

When Petroski arrived, he and his partner entered the Bardsley residence and spent approximately 45 minutes investigating the murder scene. Petroski then told his partner to continue making diagrams of the scene and that he was "just going to follow this blood." Petroski followed the trail of blood to the D'Crenza residence and entered. He had not been informed that the house had been previously searched. An officer had told Petroski that it was believed the suspect was seen fleeing down the street, but Petroski testified that he did not know whether the person seen was "the person who actually committed the [murder]." Petroski also thought it possible that the officers might have forgotten to search the D'Crenza residence for a suspect because "I have been doing this for eight years and the most obvious things are overlooked a lot of times . . . ." He further testified that he entered the D'Crenza residence because (1) he was not certain the house had been searched, and (2) he was following the trail of blood in the hope of expediting the killer's arrest.

As he followed the trail through the house, Petroski observed evidence in plain view. He did not seize the evidence at the time for two reasons. First, he believed time was of the essence if the killer was to be captured; as he testified, "the longer I waited, the easier it would be for that person to get away." Second, the items had to be photographed before they were moved and the photographer had not yet arrived. ("[T]he reason for the photos of evidence is to show the prosecution and the defense where these items were before they were moved, because once you move them, you can never put

them back in the same place.") When the trail of blood led Petroski back outside, he instructed another officer to "Watch this place. Don't let anybody go inside."

Petroski then followed the trail down the street. After capturing defendant, he returned to the D'Crenza home where he met a photographer, a criminalist, and a fingerprint specialist. Petroski supervised the photographing and seizure of evidence at the Bardsley and D'Crenza homes. Among the items of evidence seized at the D'Crenza residence was the murder weapon, a towel, some masking tape, blood-stained jogging shorts, and some cigarettes. Defendant unsuccessfully moved to suppress this evidence (see § 1538.5).

In denying defendant's suppression motion, the court stated, "There is no question, I do believe Petroski. I think he was being very careful, very meticulous. He was going about it logically. [¶] I do think he felt whoever it was who made the trail of blood still might be in the house because . . . as he indicated, people make mistakes. He's seen enough. He's been around the police enough. And sometimes when you're doing things in haste, you do make mistakes and you do overlook things he [*sic*] was looking to see. [¶] He thought there was somebody who might very well be in the house. That being the case I think he had the right to be in there."

■ The reasonableness of Petroski's entry into the house " 'is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate.' " (*Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 923 [226 Cal.Rptr. 868, 719 P.2d 242], quoting *People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].) The trial court concluded that Petroski's conduct was reasonable, and we agree.

First, the record supports the finding that Petroski did not enter the house in search of evidence; he was searching for the killer. This finding is supported by Petroski's decision to delay seizing evidence observed in plain view until after defendant was captured.

Second, Petroski was unaware that the residence previously had been searched. The court accepted Petroski's testimony that he feared other officers might have overlooked searching for the killer in the D'Crenza home. Thus, it was not unreasonable for Petroski to believe that the killer might still be within. And because time was of the essence, we believe it was reasonable for Petroski to simply follow the trail of blood into the residence instead of seeking out other officers—who were searching the surrounding hills—to inquire whether the house had been searched.

Third, Petroski was tracing the steps of the killer. Although the officer might have been able to follow the departing trail of blood on the sidewalk without ever entering the residence, he was not aware of the differing trails of blood until leaving the house. By following the trail to its endpoint, Petroski hoped to capture the murderer—and he succeeded. In sum, defendant was still at large, the surrounding area had been sealed off, and Petroski was in hot pursuit. Under the circumstances, the search was reasonable.

We also believe that Petroski's reentry into the D'Crenza residence following defendant's arrest did not constitute an unreasonable invasion of privacy. Petroski's initial entry revealed evidence in plain view. His departure occurred before the items were seized because his first priority was the search for the suspect who was still at large. As he left, however, Petroski secured the house by instructing another officer to assure that no one entered. "Thus his physical withdrawal from the [house] did not terminate what was in legal effect an uninterrupted police presence in [the residence] . . . ." (*People* v. *Amaya* (1979) 93 Cal.App.3d 424, 431 [155 Cal.Rptr. 783].) We do not believe Petroski relinquished his right to seize this evidence by giving more immediate priority to defendant's arrest. We therefore conclude that Petroski's actions, under the particular circumstances of this case, were reasonable.

We further note that the evidence seized in the house inevitably would have been discovered. (See *Nix* v. *Williams* (1984) 467 U.S. 431, 440-450 [81 L.Ed.2d 377, 385-391, 104 S.Ct. 2501]; *Green* v. *Superior Court* (1985) 40 Cal.3d 126, 136-137 [219 Cal.Rptr. 186, 707 P.2d 248].) The officers who initially entered the D'Crenza house observed blood throughout. It appeared likely that the killer had entered the house and showered; relevant evidence was probably inside. The house was secured and, as the trial court noted, "there is not a judge in the world that would not sign a warrant with these facts."

Finally, we are unconvinced that defendant suffered any prejudice through the admission of the evidence he sought to suppress. The evidence of guilt, including defendant's own admissions and the eyewitness testimony, was overwhelming and conclusive. We reject defendant's claim that "Petroski's vivid testimony concerning the 'blood-stained' items he found in [the D'Crenza] home helped paint a gruesome picture of the 'circumstances of the crime.'" The truly damning evidence was the picture painted at the murder scene, not at the D'Crenza residence. Any error in the admission of the evidence found at the latter location was therefore harmless.

## C. The Testimony of Mrs. Rodriguez's Husband

Over objection, Mrs. Rodriguez's husband, Jose, was allowed to testify regarding events occurring on the day of the murder. Among other things, he testified that he lived with his wife and two daughters; his wife told him she was going to work at the Bardsleys'; she did not smoke;[1] a certain bracelet did not belong to her; and he had never seen her wear torn or cut panties. ■ Defendant insists that the husband's testimony was unduly inflammatory and should have been excluded under Evidence Code section 352.

Defendant bases his argument on the following facts. "Defense counsel offered to stipulate to the life in being requirement, and Diane Bardsley could have testified that Mrs. Rodriguez did not smoke. No one could seriously have disputed that her underwear was not torn from waist to crotch when she put it on that morning." Defendant concludes that Mr. Rodriguez's testimony led the jury to consider "the victim's bereaved family" in deciding the guilt issues and was therefore unduly inflammatory. (Cf. *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] [victims' impact statements].)

We believe that the court did not abuse its discretion in allowing Mr. Rodriguez to testify in the limited manner set forth above. His testimony was probative. First, no other witness could testify that a bracelet found in the Bardsley residence did not belong to Mrs. Rodriguez. Second, although Diane Bardsley could testify that she had not seen Mrs. Rodriguez smoke when she came to clean each week, Mr. Rodriguez testified positively that she did not smoke. Third, regarding the condition of Mrs. Rodriguez's panties before her death, defendant had argued at trial that the condition of the panties was irrelevant. The prosecutor pointed out that he had to prove beyond a reasonable doubt that defendant intended to rape Mrs. Rodriguez. He believed that "The probative value [of the manner in which Mrs. Rodriguez's panties were torn] is that whoever did that . . . had an intent to rape her." The prosecutor stated that, "If [defendant] is willing to stipulate to that issue, then I'm willing to forego [Mr. Rodriguez's] testimony." Defendant refused. The court ruled that "Under 352 I think the probative value of the evidence clearly outweighs any possible prejudicial effect and it may be presented." In light of the prosecution's burden of proof, and in light of the probative value of the evidence, we conclude that the court acted well within its discretion in allowing Mr. Rodriguez to testify.

---

[1] Cigarettes were found in the Bardsley residence after Mrs. Rodriguez's murder. The Bardsleys did not smoke; defendant did. The prosecution wished to prove that it was defendant who brought the cigarettes with him and who smoked, not Mrs. Rodriguez. Whether she smoked was therefore relevant.

Finally, we find any inflammatory effect negligible. Although it is true that the jury learned through Mr. Rodriguez that his wife was survived by a husband and two daughters, it was already aware of the fact that Mrs. Rodriguez had a two-year-old baby girl—the infant found alive in the stroller upstairs at the Bardsley residence. Through Mr. Rodriguez's testimony, the jury learned that although the infant's mother had been murdered, the baby still had a father to care for her and therefore was not left homeless. On balance, we cannot conclude that the court abused its discretion in finding that the probative value of Mr. Rodriguez's testimony outweighed any prejudicial effect.

### D. *The Special Circumstances Findings*

Defendant concedes that the trial court properly instructed the jury that the corpus delicti of the underlying felony charges must be proved independently of defendant's extrajudicial statements. The trial court also specifically instructed the jury that an intent to kill was required in order to sustain the felony-murder special-circumstance allegations. ■ Defendant asserts, however, that the court erred in failing to further instruct the jury, sua sponte, that it was required to find defendant intended to kill independent of his extrajudicial statements. We find the contention meritless.

As the People correctly point out, we recently overruled *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], insofar as it imposed an intent-to-kill requirement to sustain a felony-murder special-circumstance finding as to the actual killer. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Here, it is uncontradicted that defendant was the actual killer, and accordingly, any error or omission in the jury instructions regarding proof of intent to kill was undoubtedly harmless.

### II. PENALTY PHASE

### A. *The Admissibility of Facts Underlying Prior Florida Felony Conviction*

As indicated previously, the People introduced evidence of defendant's prior crimes. One incident, involving a four-year-old boy, occurred in February 1977, while defendant was living in Florida. Defendant asked young Curtis M. if he would like to earn a quarter; the child said yes. Defendant took the child to his apartment and instructed him to remove his clothes. The boy complied. Defendant then removed his own clothes and made the child orally copulate him. Defendant then committed sodomy on the child,

who complained to defendant that the act hurt him. Defendant later gave the boy a quarter and told him to get dressed and go home. Defendant was arrested and charged with involuntary sexual battery. He pleaded guilty, apparently as part of a plea bargain, to committing a "lewd, lascivious and indecent assault or act upon a child."

■■■ Defendant contends that because he pleaded guilty, the prosecution was precluded from introducing the underlying facts of the case. In essence, defendant claims that his guilty plea to a "nonviolent" offense insulated him from the admission of evidence, pursuant to section 190.3, factor (b), that he in fact committed a crime involving force or violence. He urges us to hold that the prosecutor is limited to introducing such criminal activity as a prior conviction under section 190.3, factor (c). We find defendant's argument unpersuasive.

Factor (b) authorizes the introduction of evidence of criminal activity "which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Factor (c) authorizes the introduction of evidence "of any prior felony conviction" as an aggravating circumstance. Defendant pleaded guilty to a crime which did not necessarily involve force or violence. At trial, he insisted that evidence of the prior crime could be brought in *only* under factor (c), stressing that "there is not even a hint of force" in the pleading of the Curtis M. incident.

The prosecutor, however, argued, "I don't know how [defense counsel] can argue that there wasn't force required to get [defendant's] penis into a four year old's rectum. *We have evidence that it did take force because there was injury to his rectum.*" (Italics added.) The court observed that defendant had admitted the conviction but not the facts behind the conviction and ruled that "[when we examine Curtis outside of the jury's presence] we can find out if in fact there was violence." After examination of the boy outside the presence of the jury, the court ruled that it would allow the prosecutor to present the evidence under both factors (b) and (c).

We have rejected arguments similar to defendant's in two recent cases. In *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301], the defendant had contended that evidence regarding his 1972 assaults should have been excluded at the penalty phase because defendant's counsel had stipulated to defendant's conviction of these offenses. As we observed in *Gates,* "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." (Italics in original.) In *People* v. *Melton* (1988) 44 Cal.3d 713, 754-756 [244 Cal.Rptr. 867, 750 P.2d 741], we

held that the jury may consider the evidence underlying the prior violent felony convictions as aggravating evidence under both factors (b) and (c), even if bargained pleas were involved.

Defendant attempts to analogize his situation to sentence enhancement in noncapital cases. Defendant correctly observes that "the prosecution cannot go behind the record of the [prior] conviction and relitigate the circumstances of the offense to prove some fact which was not an element of the crime." (*People* v. *Jackson* (1985) 37 Cal.3d 826, 835 [210 Cal.Rptr. 623, 694 P.2d 736], citation omitted.) Defendant, however, fails to consider three crucial differences. First, in ordinary sentence enhancement cases it is the *fact of the conviction* itself which authorizes the enhancement, as opposed to the aggravating circumstances surrounding the offense. Second, although the relevant statutes concerning sentence enhancement authorize only evidence of the crime rather than the conduct of the defendant, section 190.3 focuses on, and authorizes the introduction of evidence regarding, defendant's conduct. Third, the prosecutor in this case did not attempt to prove "additional unadjudicated elements" of a crime, as defendant claims; he attempted to prove relevant circumstances that were *not* necessary elements of the offense to which defendant pleaded guilty.

Defendant additionally complains that admission of evidence concerning the circumstances of the conviction violated his due process and speedy trial rights. We have previously rejected a similar due process claim. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204-206 [222 Cal.Rptr. 184, 711 P.2d 480].) ■ We have also recognized that section 190.3, factor (b), "imposes *no* time limitation on the introduction of 'violent' crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life." (*Id.,* at p. 202, italics in original.) "The penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair." (*Id.,* at p. 205, fn. 32.) ■ For the same reasons, we reject defendant's claim that the introduction of evidence of his prior offense constituted double jeopardy. Defendant was not placed twice in jeopardy for the same offense; rather, evidence of the offense was admitted to assist the jury in its determination of the appropriate sentence. (See *People* v. *Melton, supra,* 44 Cal.3d at p. 756, fn. 17.)

B. *Unadjudicated Florida Rape and Assault*

During the penalty phase, the prosecution also presented evidence of an unadjudicated prior sex crime. Patricia H. testified that defendant brutally

assaulted and raped her and forced her to participate in oral copulation and sodomy. Mrs. H.'s son confirmed the criminal acts. The investigating officer, Detective McDaniel, testified that a warrant had been issued for defendant's arrest for these offenses but that he had not been captured.

■ Defendant claims that section 190.3, factor (b), which authorizes the introduction of evidence of unadjudicated prior criminal acts, is unconstitutional because the sentencing jury is unable to consider such evidence impartially. Defendant concedes that we have already rejected his contention in *People* v. *Balderas, supra,* 41 Cal.3d 144, 204-206, but argues that we did so on federal grounds rather than state grounds. A close reading of *Balderas* reveals that we rejected the due process claim on both federal and state grounds. We see no reason to reconsider that holding. (See also *People* v. *Howard* (1988) 44 Cal.3d 375, 425 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1284 [232 Cal.Rptr. 849, 729 P.2d 115].)

## C. *Reference to Defendant's "Doing Time"*

During direct examination of Patricia H., the witness testified that defendant sexually assaulted her. She testified that at one point defendant ordered her to make him a glass of ice tea and that she complied. When she handed him the glass, defendant told her to bring him some paper towels to wrap around the glass. Mrs. H. asked, "What is that for? So your fingerprints won't be there?" Defendant responded, "Yes. I've done enough time. I know all the tricks."

Prior to the witness's testimony about the statement, a conference was held at the bench. Defense counsel objected to the introduction of the statement "I've done enough time." The prosecution insisted that it was probative of Mrs. H.'s state of mind because "It is all part of the threat and fear . . . that he is instilling in her to get her to commit these sexual acts." The court concluded the discussion by stating, "Under 352 I'll exclude [the testimony concerning prior jail time] for right now." The prosecutor instructed Mrs. H. that she was not to testify about that sentence unless she was subsequently instructed that she may do so. Mrs. H., however, thereafter testified that defendant had said "he'd done enough time," and "he knew all the tricks." A conference was again held at the bench in which defense counsel moved for a mistrial. The court, apparently reconsidering its earlier ruling, denied the motion stating, "I don't think it is adding that much prejudice to it." During closing argument, the prosecutor made reference only to the fact that defendant was "[a] man who knows all the tricks" and not to the fact that he had "served enough time."

■ Defendant maintains that reference to the fact that he had served time was improper and that the prosecutor committed misconduct by eliciting such testimony. We are unconvinced that these references were improper: The prosecutor had to prove beyond a reasonable doubt that defendant assaulted Mrs. H.; defendant's statements disclosed the threat and fear which pervaded the crime. Moreover, any error was not prejudicial. The jury knew that defendant previously had sodomized Curtis M., and had been *convicted* of a lewd act on a child. Once Mrs. H. revealed that defendant had "served . . . time," defense counsel elicited testimony from defense witnesses that the jail time defendant served was in connection with the Curtis M. case.

■ We also reject defendant's claim that the prosecutor committed misconduct. No misconduct occurs if a witness is explicitly instructed not to discuss a certain subject area but, as here, ignores that directive. (See *People* v. *Seaton* (1983) 146 Cal.App.3d 67, 76-77 [194 Cal.Rptr. 33].) The question the prosecutor asked was entirely proper in light of the fact that the witness had been told to limit her answer to defendant's statement that he "knew all the tricks."

D. *Prosecutorial Misconduct During Closing Argument*

Defendant raises several claims of error concerning the prosecutor's closing argument at the penalty phase. We conclude that any misconduct was harmless.

1. *The Prosecutor's Reference to Mrs. Rodriguez's Baby*

■ Defendant first claims the prosecutor improperly referred to the fact that Mrs. Rodriguez's two-year-old daughter was found in a stroller at the scene of the murder. Defendant objected to the argument on the ground that, prior to the guilt phase, the court had ordered the prosecutor not to emphasize the fact that the baby was present. Following the prosecution's penalty phase reference to the baby, defendant moved for a mistrial arguing that the prosecutor had disobeyed the court order.

The trial court denied the motion stating, "my ruling was for the guilt phase. Everybody understood that it was for the guilt phase." The court deemed the statement proper during closing argument of the penalty phase because it fell within the scope of section 190.3, factor (a), in that it was a "circumstance of the crime." Defendant argues at length that the presence of the child was not a circumstance of the crime. The People argue that evidence concerning the persons in the house when Mrs. Rodriguez was murdered was a circumstance surrounding the crime and, accordingly, was

properly admitted under section 190.3. In any event, it seems apparent a brief reference to the baby's presence could not have prejudiced this defendant.

2. *Reference to Defendant's Future Dangerousness*

During his closing argument the prosecutor briefly referred to the likelihood of defendant's future dangerousness. Defendant does not challenge the words or analogies the prosecutor used in conveying to the jury defendant's potential risk to others; the manner in which the argument was presented was clearly proper under *People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144] (prosecutor may "vigorously" argue his case). Instead, defendant relies on *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767 [175 Cal.Rptr. 738, 631 P.2d 446], wherein we held that the prosecution may not rely on a psychiatric expert's opinion as to a defendant's future dangerousness. (29 Cal.3d at p. 767; see also *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782] [limitations on evidence admissible at penalty phase under 1978 death penalty law].)

In *People* v. *Miranda, supra,* 44 Cal.3d 57, we stated that "a prosecutor's comments on a defendant's future dangerousness are 'within the proper bounds of argument to the jury.' [Citation.]" (P. 111.) In *Miranda,* we doubted that "a prosecutor's comments during closing arguments present the same potential for prejudice" as an expert's prediction of violence. (*Ibid.*) In the present case, the prosecutor's brief remarks were not phrased in terms of an expert opinion or prediction. We conclude that no misconduct occurred here.

3. *Reference to Defendant's Proximity to a Woman at the Counsel Table*

Defendant complains that part of the prosecutor's closing argument was improperly calculated to convince the jury that defense counsel arranged to have a woman sit next to defendant throughout the trial "as a tactic to make him seem less dangerous than he [defense counsel] knew him in fact to be." The thrust of the prosecutor's argument was that defendant's in-court *behavior* should be put in perspective: his life was on the line and accordingly he had a strong interest to act in a well-behaved manner. But, the prosecutor argued, defendant had a history of violent criminal activity that portrays him in a different light. We believe that the prosecutor acted well within the range of vigorous argument authorized by *Fosselman, supra,* 33 Cal.3d at page 580. Accordingly, we find no prosecutorial misconduct.

### 4. *Comments on the Judicial System*

██ Defendant next contends, "the prosecutor suggested that the judicial system had unfairly permitted [defendant] to plead for his own life, while denying the victim any comparable rights." Defendant failed to object to the statements which form the basis of his claim, and he is therefore precluded from raising this issue on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, defendant's claim may be rejected on its merits. Defendant's contention that, in essence, the prosecutor was characterizing the judicial system as "unfair" is without merit. The prosecutor simply told the jury that it knew very little about victim Mrs. Rodriguez because she was dead; she could not come before the jury and plead her case. Defendant, on the other hand, had been in the jury's view for almost five weeks. The prosecutor stressed, "We don't hear much about the victim [of a crime]. And that's really a concern because it's like out of sight, out of mind." He then urged the jury to "speak for Paula Rodriguez," and "think of the last . . . minutes that Paula Rodriguez went through, because that's what you're asked to consider as an aggravating circumstance."

A similar point arose in *People* v. *Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776], in which we concluded "that because of its obvious relevance to a moral assessment of the crime, the prosecution's invitation to the jurors to project themselves into the role of the . . . victim in this case was insufficiently inflammatory to justify reversal. Although the argument no doubt evoked an emotional response, that reaction is attributable more to the gruesome nature of the crime than to the perspective from which it was portrayed."

Defendant also asserts that the prosecutor improperly implied that defendant was not entitled to his constitutional rights. Defendant reads the challenged statements out of context. The prosecutor observed that defendant's mother had pleaded for her son's life. He told the jury, "We have in this procedure, *and it should be so,* the defense can present whatever it wishes in mitigation." (Italics added.) But the prosecutor then argued that defendant had murdered Mrs. Rodriguez and that no one could plead for her life. We believe that this argument also constituted nothing more than proper vigorous argument as allowed by *Fosselman, supra,* 33 Cal.3d at page 580. Accordingly, we conclude that defendant has not demonstrated prosecutorial misconduct.

### 5. *Improper Davenport Argument*

During closing argument, the prosecutor reviewed the evidence presented by defendant at the penalty phase and stated, "I submit to you that there is

absolutely no evidence [defendant] was under the influence of extreme mental or emotional disturbance." (See § 190.3, factor (d).) The prosecutor also summarized facts before the jury which indicated that defendant acted deliberately and concluded, "It is [the] People's contention that the fact that there was no influence of a strain, mental or emotional disturbance, is a factor in aggravation, and you should give it the proper weight." Similar comments were made regarding the lack of evidence that defendant (1) had an accomplice, or (2) was affected by intoxication or mental disease. (See § 190.3, factors (h), (j).) As to the other potentially mitigating factors, the prosecutor simply suggested that the jury give them the weight the jury deemed appropriate, e.g., "You can decide what weight to give the age of the defendant."

The suggestion that absence of a mitigating factor may be deemed an aggravating factor was held improper in *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]. (See also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790 [230 Cal.Rptr. 667, 726 P.2d 113].) ▇▇ Defendant notes that the court failed to instruct the jury that the absence of a mitigating factor may not be considered as an aggravating factor.

We observe that our *Davenport* ruling directed prosecutors "in the future" to avoid such argument, language indicating that ruling was prospective only. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 775 [239 Cal.Rptr. 82, 739 P.2d 1250].) The present case was tried before *Davenport* was decided and accordingly, the trial court and prosecutor lacked the benefit of *Davenport's* teachings. In any event, we conclude that any argument improper under *Davenport* was harmless here.

During his own closing argument, defense counsel took issue with the prosecutor's argument. Counsel explained that it was impermissible for the jury to consider the fact that certain potentially mitigating circumstances were absent as an aggravating circumstance. He stressed that the law required the listed factors to be considered only "[i]f they are applicable" and pointed out to the jury that "Many of them are not." Counsel conceded that certain factors—such as mental disease or defect—were not present but reasoned that it would be fundamentally unfair and illogical if their absence were deemed an aggravating circumstance.

For example, counsel argued, "There is a factor that [reads] 'whether or not the defendant was an accomplice to the offense and his participation in the commission of [the] offense was relatively minor.' Do you really think that when the legislature passed that factor they [meant that] . . . because [a defendant] did not commit [a] crime with another codefendant that . . .

[he is more culpable]?" "[That is] not the case. How could it possibly be the case? How could it possibly be the case [that] these are factors you are to consider?" Counsel also made the same argument concerning the age of a defendant, arguing that age may be considered only if it is applicable, e.g., "if he were a youngster of 18 or 19." But if age is not a mitigating circumstance, he continued, it simply should not be considered. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 788-789.) We believe defense counsel's comments considerably clarified the prosecutor's earlier remarks.

Moreover, it is not reasonably possible that the prosecutor's remarks affected the penalty verdict. The prosecutor merely mischaracterized as "aggravating" the absence of certain mitigating factors. Despite the prosecutor's argument, the jury was well aware of the underlying *facts,* and was free to place whatever weight it wished upon these facts. As explained below, the jury was instructed that it was to consider and weigh any and all evidence which constituted aggravating or mitigating circumstances. The jury was also told that it was not simply to "add up" the relative number of aggravating and mitigating factors, but rather to give each separate factor whatever weight it deemed appropriate. Further, the jury was instructed that even a single mitigating circumstance could outweigh all of the aggravating circumstances. Thus, the jury knew that each factor—whether in aggravation or mitigation—was to be weighed in light of the evidence presented, and not the number of factors within which the evidence might fall. We conclude that any improper prosecutorial argument violating *Davenport* was harmless under the facts of this case.

Defendant also raises the related claim that the court should not have instructed the jury in the language of section 190.3, factors (d) through (j), because they were "inapplicable" to the facts in this case. We have previously rejected this claim. (See *People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777 [1977 law]; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105 [1978 law].)

E. *Instructions on Mitigating Evidence*

In the present case, the court substantially modified the terms of former CALJIC No. 8.84.1(k) to clarify the jury's responsibility to consider *all* the mitigating evidence submitted by defendant, whether or not it extenuated or mitigated the gravity of defendant's crimes. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) We held in *People* v. *Brown* (1985) 40 Cal.3d 512, 544, footnote 17 [220 Cal.Rptr. 637, 709 P.2d 440], that we should review all pre-*Easley* cases to determine if, on the basis of the whole record, the jury was adequately informed of its duty

to consider all of the defendant's relevant mitigating evidence. The present case was tried after *Easley,* and the new instructions used here should obviate any need for extensive *Brown* review. Nonetheless, we have performed such a review and have concluded that the jury was not misled here.

As indicated previously, the instructions were modified in such a manner that the jury was expressly instructed to consider "any other aspect of the defendant's character or personal history that the defendant offers as a basis for a sentence less than death." Moreover, the prosecutor made it clear that the jury could consider defendant's personal history, and could, as he characterized it, "load up on sympathy" for defendant if the jury believed it appropriate.

 It is true that the prosecutor argued that defendant did not deserve any sympathy, and indeed at one point stated to the jury that "I really believe that you [would be] avoiding following and upholding the law in this case" if the jury rejected a death penalty based on sympathy considerations. But this argument was preceded by an explanation to the effect that the jury had the right to "put little weight" on the aggravating circumstances and "put the big weight" on sympathy factors, thereby rejecting a death sentence. The prosecutor argued that reliance on sympathy factors in this case would be "an example of . . . misplaced compassion," which the jury should avoid. At one point, the prosecutor characterized sympathy as "the most dangerous emotion," because it can be so readily misused.

Read in the context of the entire argument, we believe the prosecutor was simply advocating that, although the jury was entitled to consider sympathy for defendant, nevertheless under the evidence in this case, the aggravating circumstances outweighed any mitigating effect arising from defendant's background and character evidence. (See *People v. Allen, supra,* 42 Cal.3d at p. 1276.) Defense counsel, on the other hand, explained that although defendant's background did not excuse his crimes, it may offer a reason for not executing him. On balance, we conclude that the prosecutor's argument was a proper one which did not mislead the jury.

F. *Sentencing Instructions—Asserted Brown Error*

The jury was instructed in the language of former CALJIC No. 8.84.2, to the effect that the jury "shall" impose death if the aggravating circumstances outweighed the mitigating ones. As we explained in *People v. Brown, supra,* 40 Cal.3d 512, 536-544, and *People v. Allen, supra,* 42 Cal.3d 1222, 1276-1277, such an instruction, together with the arguments of counsel, may mislead a reasonable jury to believe (i) its sentencing responsibility was to be discharged by a mere "counting" of aggravating and mitigating

factors, or (ii) that it was permitted to arrive at its sentencing decision without having to exercise its moral discretion and decide whether death is the *appropriate* penalty for this offense and offender. (*Allen, supra,* 42 Cal.3d at pp. 1276-1277.)

In the present case, the court modified the standard instructions and additionally instructed that "one mitigating circumstance may outweigh several aggravating circumstances . . . . You shall give to each the weight to which you find it to be entitled." This supplemental instruction was sufficient to explain to the jury that its penalty decision should not be based on a mere counting of the various factors.

Defendant observes that at one point in his closing argument the prosecutor argued that "you [the jury] cannot find that the aggravating circumstances outweighed mitigating and vote for life without the possibility of parole because the law says 'shall.'" In addition, the prosecutor described the sentencing process as involving a "mathematical formula" once the jury decides that the aggravating circumstances outweigh the mitigating ones. But the prosecutor also explained to the jury that "it is your decision to put the weight on these different [sentencing] factors," and further noted that "[i]t's not a situation where you add up those factors and then because of the number of factors on each side you decide."

Although each case must be examined on its own merits, in a recent case, we concluded that a similar prosecutorial reference to a "mechanical" sentencing process was not likely to have misled the jury in light of the prosecutor's subsequent remarks acknowledging that the jury had the ultimate control over the penalty determination. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 104; see *People* v. *Hendricks* (1988) 44 Cal.3d 635, 653 [244 Cal.Rptr. 181, 749 P.2d 836].) In light of the fact that the jury was expressly instructed that it might assign whatever weight it chose to the particular sentencing factors, the prosecutor's argument could not have misled the jury. Read in context, the prosecutor was simply advising the jury that it should not *arbitrarily* base its sentencing decision on considerations other than a weighing of the applicable aggravating and mitigating factors in the case. In light of the entire record, we believe the jury understood the nature of its weighing function.

As for our second concern in *Brown,* namely that the jury realize that through its weighing function it is responsible for determining the appropriateness of the death penalty in this case, our review of the closing arguments indicates the jury was fully advised of this aspect of its sentencing task. First, the prosecutor argued that "I would like to remind you of your oath . . . to uphold the law. In fact, each one of you said that you would in

an appropriate case impose the death penalty, meaning you would vote for the death of Mr. McDowell *if it was an appropriate case.* There is really no higher responsibility than you as a citizen are asked to fulfill than to sit in judgment on another human being, especially when you have to sit in judgment as to whether Mr. McDowell will live or die. That is a responsibility of the highest order in our society." (Italics added.) Defense counsel thereafter explained the precise nature of the jury's sentencing responsibility by asking the jurors to decide "is this the kind of situation that the death penalty is appropriate for?" Thus, both prosecutor and defense counsel's arguments adequately explained the necessity for the jury to determine the appropriate penalty.

### G. *The Jury Request for Clarification*

In the midst of its penalty deliberations, the jury sent a note to the court which stated: "Direction. We have an 11-to-1 vote for death. The one juror emphatically feels the mitigating circumstances are equal to the aggravating circumstances. The other eleven jurors do not agree with the one juror's mitigating circumstances as all being testimony or evidence that should be considered. [¶] Please advise which following circumstances can be considered mitigating circumstances: (1) inadequate or insufficient psychiatric help; (2) love-hate relationship with father/mother; (3) daily extreme mental and physical abuse by father, also witness to daily physical abuse to mother and siblings; (4) religious extremes confused defendant; (5) confusing sexual mores at home, parent incest with mother condoning or aware of incest/abuse; (6) accused of death of favorite sister; (7) stress of divorce from family; (8) rejection of mother's love during teen years. [¶] Thank you."

The court discussed the matter with counsel, explaining, "I feel I cannot say anything in light of the sentence which indicates which way they are voting, and anything I say at this particular time will be coercive." Defense counsel opined that the other jurors were trying to convince the one holdout juror that the factors she was relying upon were improper. Counsel maintained, "This one juror is obviously getting pressure from the eleven people as to whether . . . she is even following the law; and in my judgment that question ought to be answered. I don't know if it's going to kick the other eleven over [to vote for life without possibility of parole]." The prosecutor suggested that the jury simply be instructed to deliberate further.

The jury was called in and the court answered the question as follows: "You're asking me, in essence, to decide the case for you. You have been instructed as to the law and I hate to throw you out like this, but if you go back and read the instructions, in particular you have one instruction in

which the mitigating and aggravating factors are listed. Then you have another instruction, the concluding instruction which reads as follows: 'One mitigating circumstance may outweigh several aggravating circumstances or one aggravating circumstance may outweigh several mitigating circumstances. You shall give each the weight to which you find it to be entitled.' [¶] Those are the two instructions that I think really apply. I would ask you to go back [and] reread those instructions . . . . [R]esume your deliberations and see if you can arrive at a verdict. If you can you can. If you can't you can't. All right?" The jury returned a verdict of death after an additional day of deliberation.

■■■ The thrust of defendant's argument is that because the items listed in the note should have been considered as mitigating factors, the court should have directly instructed the jury that those factors were proper circumstances in mitigation.

As the court noted in discussions with counsel, however, the court feared the jury was asking it "to interpret the evidence, something I cannot do." The court could not properly evaluate or assess the mitigating (or aggravating) nature of the particular items listed in the jury's note for fear of unduly coercing the deliberations. On the other hand, the court properly could have explained to the jury that it was free to consider *any* aspect of defendant's background or character which defendant offered as a mitigating circumstance, and that some, if not all, of the listed factors, reasonably could fall within that category.

Nonetheless, the court's handling of the matter, directing the jury to the applicable instructions, does not appear inappropriate. In a slightly different context, we noted that, "the aggravating and mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149].) Here, the court advised the jury to reread the list of sentencing factors (which, significantly, included the expanded "catchall" provision factor (k)), and to recall that even one mitigating circumstance may outweigh several aggravating circumstances. Thus, the jurors should have become well aware that defendant's background and character could be considered as circumstances in mitigation, and that they could properly determine that these circumstances were entitled to a weight exceeding the weight of the aggravating circumstances. The jurors deliberated for another day before the original holdout juror apparently concluded that the aggravating circumstances in this case outweighed the mitigating aspects of defendant's background. We conclude that the court's response, which could have been more explicit, adequately informed the jury regarding its consideration of defendant's mitigating evidence.

## CONCLUSION

The judgment is affirmed in its entirety.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in affirming the judgment of guilt and the finding of special circumstances.

I dissent from the imposition of the death penalty. The record demonstrates that 11 jurors erroneously thought that most of defendant's character and background evidence could not be considered in determining penalty. When a jury asks a question showing that it does not understand an instruction, the court must not simply repeat the instruction which the jury has failed to understand. To fail to clarify the instruction is to assure that the jury will persist in its misunderstanding. The court's failure to explain that defendant's character and background evidence was relevant to the penalty determination is an error which alone would require reversal in this case.

In addition, the prosecutor's argument to the jury further misled the jury as to its function. He asked the jury to use a formula characterizing the absence of evidence of mitigating factors as aggravating, and asked the jury to place particular weight on the absence of evidence of mental defect and diminished capacity, as an aggravating factor. The prosecutor stressed that the law required the imposition of the death penalty if aggravating factors (which he had inflated) outweighed mitigating factors. Thus the jury not only ignored large portions of the defendant's mitigating evidence, but was led to grossly overestimate the case in aggravation, and to feel that the death penalty was mandatory in the circumstances. There is no principled basis for affirming this death judgment.

### I.

A jury deciding whether to impose the death penalty may consider evidence that the defendant proffers about his character and background. (*Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].) Our high court has recently reaffirmed that a jury in a capital case may not be precluded from considering any character or background evidence, or other relevant evidence, which is offered in mitigation. (*Mills v. Maryland* (1988) 486 U.S. 367 [100 L.Ed.2d 384, 108 S.Ct. 1860], citing *Eddings v. Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett v. Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at pp. 889-890.) In *Mills,* the court vacated a judgment of death because of the risk that the

jury understood a standard verdict form and accompanying instructions to mean that members of the jury could not consider any mitigating circumstance unless the jury unanimously agreed that the circumstance had been shown. The court had no extrinsic evidence, only the verdict form and the trial judge's instructions. Yet the court found that it would be quite possible for a reasonable juror to interpret the verdict form to require unanimity, and that this risk required that the judgment be vacated. (*Mills* v. *Maryland, supra,* 486 U.S. at pp. __ - __ [100 L.Ed.2d at pp. 397-399].)

Normally, as in *Mills,* we have only circumstantial evidence on the question whether the jury understands that the defendant's character and background evidence is relevant to its penalty determination. We consider whether the instructions were clear or ambiguous, conceding that instructions in the terms of Penal Code section 190.3 are ambiguous (*People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813], and we inquire whether the prosecutor may have misled the jury in argument (*California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837], conc. opn. of O'Connor, J.)

All that careful parsing of the evidence is totally unnecessary in this case. The jury put it on the record that 11 of the jurors thought that most of defendant's mitigating character and background evidence could not be used in determining penalty. The court did nothing to dispel this misunderstanding.

After nine hours of deliberation the jury sent the following note to the trial court: "Direction. We have an 11 to 1 vote for death. The one juror empathically [*sic*] feels her mitigating circumstances are equal to the aggravating circumstances. The other 11 jurors do not all agree with the one juror[']s mitigating circumstances as all being either testimony or evidence that should be.considered. Please advise which [of the] following circumstances can be considered mitigating circumstances. [¶] 1. Inadequate or insufficient psychiatric help. [¶] 2. Love/hate relationship with father/mother. [¶] 3. Daily extreme mental and physical abuse by father, also witness to daily physical abuse to mother and siblings. [¶] 4. Religious extremes confused defendant. [¶] 5. Confusing sexual more's [*sic*] at home (incest), with mother condoning or aware of incest/abuse. [¶] 6. Accused of death of favorite sister. [¶] 7. Stress of divorce from family. [¶] 8. Rejection of mother's love during teen years. [¶] Thank you."

The majority say that the court could not interpret the evidence for the jury, though it "could have explained to the jury that it was free to consider *any* aspect of defendant's background or character which defendant offered as a mitigating circumstance, and that some, if not all, of the listed factors,

reasonably could fall within that category." (Maj. opn., *ante,* at p. 578.) Of course, this is precisely what the court should have done. A jury which does not believe that defendant's character and background evidence is relevant to determining penalty, as the majority of this jury did, has gravely misunderstood one of the basic elements of its task. It is of paramount importance that the court find language to convey to the jury, as the standard instruction obviously did not, that it is to consider defendant's mitigating evidence.

Instead the court here redirected the jury to the instructions it had already given. It instructed the jury that there were two relevant instructions. One listed the mitigating and aggravating factors. The other stated that one mitigating circumstance may outweigh several aggravating circumstances, and vice versa, depending on the weight to which the jury thought the circumstance was entitled. But the jury's very question demonstrated it did not understand these instructions. There is no point in reiterating language which has failed to enlighten the jury. There is no basis for concluding, as the majority opinion does, that the court's response adequately informed the jury regarding the evidence it was permitted to consider in mitigation. There remains not only a risk but a certainty that the jury failed to understand its constitutional obligation to consider all of defendant's mitigating evidence.

## II.

Not only did this jury misunderstand the relevance of defendant's evidence in mitigation, it was also led to misunderstand the weight and persuasiveness of the case in aggravation. If we examine the instructions and the arguments of the prosecutor, we find a serious risk that the jury counted the lack of evidence of mitigation as evidence in aggravation and that it thought that the death penalty was mandatory if aggravating circumstances outweighed mitigating circumstances. The likely result is that the jury seriously misunderstood its function. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861] [absence of evidence on a statutory mitigating factor is not to be used in aggravation]; *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown, supra,* 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115] [jury must understand that apparently mandatory sentencing instruction actually requires individual determination of appropriateness of death penalty].) We should reverse the death penalty judgment even if we did not know for a fact that 11 jurors misunderstood what evidence could be considered in mitigation.

As the majority concede, absence of evidence of a mitigating factor cannot be considered an aggravating factor. (*People* v. *Davenport, supra,* 41

Cal.3d 247, 289-290.) The prosecutor here placed all the factors in a formula, listing only "age" and "sympathy" as mitigating, and emphasizing the absence of evidence of the other mitigating factors as circumstances in aggravation. He asked the jury to place particular aggravating weight on the absence of evidence of mental defect or diminished capacity. Since the majority decide that the *Davenport* error was harmless here, I do not take seriously the majority's inconsistent dicta in which they hint that they should not reach the issue they decide.[1]

The *Davenport* error was not harmless. I reject the notion that anything defense counsel said cured the harm caused by the prosecutor's mischaracterizations. The majority maintain that what defense counsel said "clarified" the prosecutor's remarks. On the contrary, it contradicted them. We cannot be certain whom the jury believed, but I find it highly likely that the jury would be influenced by the prestige of the prosecutor's public office to follow the prosecutor's characterization. (See *People* v. *Talle* (1952) 111 Cal.App.2d 650, 677 [245 P.2d 633]; see also White, The Death Penalty in the Eighties (1987) p. 97.) Further, the verdict shows that defense counsel's arguments lacked persuasive power.

The majority do not rely on defense counsel's arguments alone, however. They find the error nonprejudicial because "[t]he prosecutor merely mischaracterized as 'aggravating' the absence of certain mitigating factors." (Maj. opn., *ante,* at p. 574.) This is like saying that *Davenport* error is nonprejudicial because it was merely *Davenport* error.

The majority find further reassurance in that despite what the prosecutor said, "the jury was well aware of the underlying *facts,* and was free to place whatever weight it wished upon these facts." (Maj. opn., *ante,* at p. 574.) This is true, but it proves nothing. The point of *Davenport* error is that it allows the jury to place weight on a nonfact—the absence of evidence. The jury may be aware of the facts, yet be misled into thinking that the absence of evidence in mitigation makes the aggravating facts of which they are aware weightier.

It is settled that there is a danger that an instruction in the apparently mandatory language of Penal Code section 190.3 will cause jurors to think that they must weigh aggravating against mitigating circumstances without

---

[1] The majority suggest, on one hand, that defendant's argument is barred because he failed to object at trial, even though such an objection would have to be based upon the reasoning of *Davenport,* a case not yet decided. They suggest, on the other hand, that defendant could not object because *Davenport* does not apply to cases tried before it was filed. The majority's first suggestion is inconsistent with *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, footnote 15 [245 Cal.Rptr. 185, 750 P.2d 1342]; their second is inconsistent with numerous cases which have assumed the retroactive effect of *Davenport.*

regard to their personal view as to the appropriate penalty, and impose the death penalty despite a personal conviction that the penalty is not appropriate in the particular case. (*People* v. *Brown, supra,* 40 Cal.3d 512; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1277.) This danger becomes even more serious when the prosecutor gives false weight to the case in aggravation by arguing that lack of evidence in mitigation should be weighed in aggravation.

The prosecutor tried to persuade the jury that the death penalty was mandatory in this case. He stressed the mandatory terms used by the standard jury instruction, and claimed that once the jury had weighed aggravating against mitigating factors, its decision would be made. He emphasized that the process was automatic whichever way it turned out, so that if mitigating factors predominated, the verdict must be life in prison, but that if aggravating factors predominated, the verdict must be death. He reviewed the evidence relating to each factor, arguing the absence of evidence of mental disease or diminished capacity as particularly worthy of consideration as an aggravating factor, and then produced a formula in which each statutory factor was designated aggravating except that "age" and "sympathy" might be considered in mitigation. Under his formula, he claimed that the aggravating circumstances far outweighed the mitigating, and that for this reason, "the law says that you shall impose death."

I agree with the majority that with the court's supplemental instruction that one mitigating circumstance can outweigh several aggravating circumstances, and with the prosecutor's argument to the same effect, there is no danger that the jury simply counted up the factors and imposed death because there were more factors in aggravation. However, I cannot agree that this jury was made to understand that once it balanced the factors, it should impose the penalty that seemed normatively appropriate. The trial court's instruction that the jury might assign whatever weight it chose to the sentencing factors did not inform the jury that after they weighed the factors, they still had to determine what penalty was appropriate. The fact that the prosecutor used the word "appropriate" twice during argument is hardly conclusive. It is true that the prosecutor reminded the jury of the high responsibility of its task, and referred to each juror's statement on voir dire that he or she would vote to impose the death penalty on defendant if it were an appropriate case. But then the prosecutor told the jurors how to determine if it were an appropriate case. He told them to weigh the factors and impose death if aggravating factors outweighed mitigating. He made the aggravating factors look weightier by arguing that lack of evidence of a factor in mitigation could be aggravating. He told them that they could not impose the penalty of life without possibility of parole if they determined that aggravating circumstances outweighed mitigating and he explained that this was because of the mandatory wording of the death penalty stat-

ute. Nothing in the court's instructions dispelled this erroneous characterization.

### III.

I am convinced that the majority of the jury misunderstood the law and thought that most of defendant's character and background evidence was irrelevant. This alone should cause us to reverse the penalty judgment. But not only did the jury disregard most of the evidence in mitigation, the prosecutor erroneously inflated the weight of the evidence in aggravation, and mischaracterized the jury's function in selecting the appropriate penalty. We should not countenance a distortion of the jury's function which allows it to disregard the evidence in mitigation, add false weight to the evidence in aggravation, and then select the death penalty under the misapprehension that the inflated list of aggravating factors gave it no other choice. I would reverse the death judgment.

Mosk, J., concurred.

A petition for a rehearing was denied November 10, 1988, and the opinion was modified to read as printed above.