107 F.3d 1351
 46 Fed. R. Evid. Serv. 749, 97 Cal. Daily Op.
Serv. 1360,
97 Daily Journal D.A.R. 2002
Charles E. McDOWELL, Petitioner-Appellant,
v.
Arthur CALDERON, Warden of the California State Prison at
San Quentin, Respondent-Appellee.
 No. 96-99000.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 21, 1996.
Decided Feb. 26, 1997.
 
 Andrea G. Asaro, Rosen, Bien & Asaro, San Francisco, California, for petitioner-appellant.
 Robert F. Katz, Deputy Attorney General, Los Angeles, California, for respondent-appellee.
 Appeal from the United States District Court for the Central District of California, Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-90-04009-MRP.
 Before: WIGGINS, THOMPSON and TROTT, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 In 1984, a jury in California found Charles E. McDowell, Jr., guilty of murder, attempted murder, attempted rape, and burglary. The jury found true the special circumstances of felony murder/burglary and felony murder/rape. McDowell was sentenced to death.
 
 
 2
 After exhausting his claims for relief in state court, McDowell filed his first amended petition for federal habeas relief in the district court. This is an appeal from the denial of that petition. In the petition, McDowell argues he received ineffective assistance of counsel during the guilt phase of his trial and asserts several errors occurred during the penalty phase. We have jurisdiction under 28 U.S.C. § 2253, and we affirm.
 
 FACTS
 
 3
 On May 20, 1982, Paula Rodriguez was working as a house cleaner at the Bardsley residence. At that time, McDowell was living with his companion, Lea D'Crenza, in the same neighborhood. At approximately 1:00 p.m., neighbors heard screams coming from the Bardsley residence. Theodore and Dolores Sum telephoned the Bardsleys. They heard more screams through the telephone and then it was disconnected.
 
 
 4
 The Sums went to the Bardsley home to investigate. Theodore Sum opened the front door and saw a nude man whom he identified at trial as McDowell. McDowell rushed at Theodore Sum and slashed his neck with a knife. The Sums returned to their home and telephoned the police. McDowell was later seen running from the Bardsley home, into the D'Crenza home, and then, later, walking away from the D'Crenza home.
 
 
 5
 Police officers immediately arrived at the Bardsley home and found Rodriguez stabbed to death in the den. She had been cut twice on the neck; stabbed twice in the chest, once in the abdomen, and once in the left arm; and had deep knife wounds on her hands. She was lying in a supine position with her skirt pulled up, her legs apart, her underwear cut, her blouse slashed, and her body covered with blood. Seminal fluid was found on her underwear. Police officers found her two-year old daughter unharmed upstairs.
 
 
 6
 Police Officer Henry Petroski followed a trail of blood from the front door of the Bardsley home onto the sidewalk. The trail of blood led to the D'Crenza home. Officer Petroski entered the D'Crenza home and followed the trail of blood through the home. A bloodstained knife was lying on the floor in the kitchen. Officer Petroski followed the trail outside the home to a house approximately 850 feet away from the D'Crenza home.
 
 
 7
 From the bushes, Officer Petroski heard a male voice say, "Don't shoot me. Don't shoot me. I give up." Officers pulled McDowell from the bushes and arrested him. McDowell's wrist and a finger were cut. He was transported to a hospital for medical treatment.
 
 
 8
 En route to the hospital and during his stay at the hospital, McDowell made several damaging statements. For example, McDowell stated that he had watched a movie the night before which involved the rape, strangulation, and stabbing of a woman. He stated that he "felt a force" come over him and the movie made him decide to go to the Bardsley home and "hurt" Rodriguez. He further stated that the blood on his clothing belonged to Rodriguez.
 
 
 9
 McDowell was charged with murder, attempted murder, attempted rape, and burglary, in violation of California Penal Code Sections 187, 261, 459, and 664. Two special circumstances were alleged: felony murder/burglary, under California Penal Code Section 190.2(a)(17)(vii), and felony murder/rape, under California Penal Code Section 190.2(a)(17)(iii).
 
 
 10
 During the guilt phase of his trial, McDowell conceded guilt to the murder, rape, and burglary. He argued, however, that he did not have the intent to kill Rodriguez and, therefore, was not guilty of the special circumstances. After two days of deliberation, the jury found McDowell guilty on all counts and found true the special circumstances.
 
 
 11
 During the penalty phase, the prosecution presented evidence of two prior crimes committed by McDowell: a conviction for lewd and lascivious conduct, involving Curtis M.; and an uncharged rape, involving Patricia H.
 
 
 12
 In mitigation, McDowell's counsel presented family members and a former neighbor who testified about McDowell's tragic childhood, a nurse who was his primary therapist when he was incarcerated in a Mentally Disordered Sex Offender program, and a probation officer who supervised McDowell after the Curtis M. offense. After two-and-one-half days of deliberation, the jury returned a verdict of death. The state trial court imposed the death sentence.
 
 
 13
 The California Supreme Court affirmed the conviction and sentence. People v. McDowell, 46 Cal.3d 551, 250 Cal.Rptr. 530, 763 P.2d 1269 (1988). The United States Supreme Court denied McDowell's petition for certiorari. McDowell v. California, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989). In September 1989, the California Supreme Court denied McDowell's first state habeas corpus petition by a postcard denial. In March 1990, the United States Supreme Court denied McDowell's second petition for certiorari. McDowell v. California, 494 U.S. 1039, 110 S.Ct. 1503, 108 L.Ed.2d 637 (1990).
 
 
 14
 In December 1990, McDowell filed his first federal habeas corpus petition with the district court. In October 1991, the district court granted McDowell leave to file a second state petition to exhaust his ineffective assistance of counsel claims. By a postcard denial, the California Supreme Court denied the petition in July 1992. McDowell filed his amended petition in the district court in May 1993.
 
 
 15
 The district court denied McDowell's petition in November 1995, but granted McDowell a certificate of probable cause. This appeal followed.[1]
 
 DISCUSSION
 A. General Standards of Review
 
 16
 To warrant federal habeas corpus relief, McDowell, a state prisoner, must establish that his conviction or sentence violates the federal Constitution, a federal statute, or treaty. Bonin v. Calderon, 59 F.3d 815, 823 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). We review de novo the district court's denial of his habeas corpus petition. Weygandt v. Ducharme, 774 F.2d 1491, 1493 (9th Cir.1985). We review for clear error any factual findings made by the district court; the state court's factual findings are entitled to a presumption of correctness. Bonin, 59 F.3d at 823, 28 U.S.C. § 2254(d); Melugin v. Hames, 38 F.3d 1478, 1482 (9th Cir.1994).
 
 
 17
 B. Ineffective Assistance of Counsel--Guilt Phase
 
 
 18
 McDowell argues his counsel, Howard Gillingham, rendered ineffective assistance during the guilt phase of his trial because (1) Gillingham failed to adequately investigate and to present a defense based on McDowell's alleged intoxication at the time of the murder; and (2) during closing argument, Gillingham conceded McDowell's guilt of felony murder, and then did not effectively argue why McDowell lacked the intent to kill, which lack of intent would have rendered him not guilty of the special circumstance required for a sentence of death in a felony murder conviction.
 
 
 19
 Because a claim of ineffective assistance of counsel raises a mixed question of law and fact, we review the claim de novo. Harris v. Wood, 64 F.3d 1432, 1435 (9th Cir.1995). We review de novo whether counsel's performance was deficient and whether prejudice resulted from any deficient performance. Thompson v. Calderon, 86 F.3d 1509, 1515 (9th Cir.1996); see also Strickland v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (concluding state court's determination that counsel's performance was not deficient is not a finding of fact entitled to a presumption of correctness).
 
 
 20
 McDowell first must establish that his " 'counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances ... under prevailing professional norms.' " Harris, 64 F.3d at 1435 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2064-65). McDowell must overcome a "strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making decisions." Thompson, 86 F.3d at 1515 (internal quotations and citation omitted).
 
 
 21
 McDowell also must establish prejudice resulted from any deficient performance. Id. He must demonstrate " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir.1995) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068).
 
 1. Intoxication Defense
 
 22
 McDowell asserts Gillingham's performance was deficient because he failed to timely investigate whether McDowell was under the influence of alcohol or various controlled substances at the time of the murder. McDowell complains that Gillingham did not obtain timely testing of his blood and urine samples, taken on the day of his arrest. He argues that, had Gillingham presented evidence of his alleged intoxication[2] at the time of the murder, the jury would have found he did not have the intent to kill which, at that time, was an element of the felony murder special circumstances. See Carlos v. Superior Court, 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862, 865 (1983), overruled by People v. Anderson, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987).
 
 
 23
 McDowell contends Gillingham had the following information which should have prompted a thorough and timely investigation into McDowell's alleged intoxicated state at the time of the murder: Approximately a year after his arrest, in March 1983, McDowell told Marilyn Butler, a law clerk helping Gillingham, that, on the morning of the murder, he had consumed alcohol and various controlled substances. McDowell also told experts retained by Gillingham that he had consumed excessive alcohol and controlled substances on the morning of the murder. In addition, Speare Primpas, a friend of McDowell, and D'Crenza both told Gillingham that McDowell used drugs extensively.
 
 
 24
 Gillingham's investigation into McDowell's alleged intoxication was not constitutionally deficient. Gillingham requested the testing of the samples a month after McDowell told Butler he had consumed alcohol and controlled substances on the morning of the murder. The police department's report, dated May 20, 1983, stated controlled substances were not detected and McDowell's blood alcohol level was .011 at the time his blood sample was taken.[3]
 
 
 25
 Gillingham then independently had the samples tested. A report from the Institute of Forensic Sciences, dated July 5, 1983, reported no cannabinoids, ethanol, narcotics, or stimulants were detected. A report from the Center for Human Toxicology, dated October 5, 1983, reported that no LSD was detected and only a trace of THC. A note from Gillingham indicates that the THC testing indicated the marijuana was ingested days rather than hours before the samples were taken. In these circumstances, Gillingham's failure to pursue further testing of the samples was not constitutionally deficient.
 
 
 26
 McDowell also has not demonstrated that Gillingham rendered ineffective assistance by failing to have the samples tested earlier. McDowell has not shown that any delay in testing the samples affected the validity of the tests. The facilities that actually did the independent testing for Gillingham did not indicate that the results might be inaccurate due to a delay in testing. The State contradicted McDowell's expert testimony, presented during the evidentiary hearing before the district court, that the alcohol in the blood sample could have dissipated over time. The State's expert testified that the test samples would have remained stable while in storage at the police department.
 
 
 27
 Even if we were to assume Gillingham's performance was deficient, McDowell has not established that prejudice resulted from Gillingham's alleged failure to adequately investigate or to present an intoxication defense. Even if test results were obtained that indicated McDowell was under the influence of alcohol and controlled substances at the time of the murder, there was ample credible evidence which would have contradicted such tests and established that McDowell was not so intoxicated that he could not have formed the intent to kill.
 
 
 28
 A news crew videotaped McDowell's arrest. On the videotape, McDowell yells, "I'm wanted for rape in Florida. You can have all you want." After viewing the videotape, the district court found that McDowell was portrayed "in a state not resembling intoxication." This finding is not clearly erroneous. On the videotape, McDowell does not appear intoxicated. Further, after Gillingham and his experts viewed the videotape, they also came to the conclusion that McDowell did not appear intoxicated. Had an intoxication defense been presented, the jury would have viewed the videotape and likely would have reached the same conclusion.
 
 
 29
 In addition, Officer Petroski, an arresting officer, stated McDowell was not "under the influence of anything" at the time of his arrest. In his report, Officer Michel, an officer who transported McDowell to the hospital after his arrest, described McDowell's behavior in detail but did not suggest or mention that McDowell was intoxicated. Glenn Smith, a paramedic who treated and transported McDowell after his arrest, testified that he was trained to recognize when people are under the influence of intoxicants, but he did not notice any symptoms that McDowell was under the influence of alcohol or controlled substances. Also, the hospital records indicate McDowell was conscious, alert, and coherent and do not indicate that McDowell was intoxicated at the time of his arrest.
 
 
 30
 In sum, Gillingham did not render ineffective assistance by failing to earlier test the samples or to further pursue an intoxication defense. Even if the samples might have indicated some degree of intoxication, there was substantial credible evidence that McDowell's behavior was not affected. McDowell suffered no prejudice.
 
 2. Closing Argument
 
 31
 McDowell argues Gillingham rendered ineffective assistance during closing argument by conceding his guilt of felony murder. McDowell also contends he received ineffective assistance because, during closing argument, Gillingham argued that McDowell lacked the intent to kill which was an element of the special circumstances, but did not explain how the evidence related to this lack of intent. Gillingham's performance in this regard was not constitutionally deficient.
 
 
 32
 The evidence of McDowell's guilt of felony murder was overwhelming. Gillingham chose to concede McDowell's guilt of felony murder but to contest whether McDowell had the intent to kill. If McDowell did not have the intent to kill, he would not have been eligible for the death sentence. The choice of this line of defense appears to have been the best choice from a poor lot. See Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir.1995) ("The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists."), cert. denied, --- U.S. ----, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996).
 
 
 33
 We also reject McDowell's argument that Gillingham failed to present a viable argument for the jury to find McDowell did not possess the intent to kill. Gillingham argued that McDowell went to the residence with only the intent to rape Rodriguez rather than to kill her and he brought the knife with him only to threaten her. He argued that McDowell's conduct was inconsistent with a plan to kill.[4] Gillingham's performance was not deficient.
 
 C. Supplemental Instructions
 
 34
 McDowell next argues the state trial court erred by failing to give supplemental instructions, in response to a question from the jury during deliberations in the penalty phase. He asserts this error prohibited the jury from considering the mitigating evidence he presented. We conclude that, by referring the jury to the original jury instructions and by rereading an instruction, the state trial court accurately informed the jury of the applicable law and adequately responded to the jury's question.
 
 
 35
 During the third day of deliberations in the penalty phase, the jury sent the court a note which stated:
 
 
 36
 We, the jury in the above entitled action, request the following:
 
 
 37
 Direction. We have an 11 to 1 vote for death. The one juror empathically [sic] feels her mitigating circumstances are equal to the aggravating circumstances. The other 11 jurors do not all agree with the one juror[']s mitigating circumstances as all being either testimony or evidence that should be considered. Please advise which following circumstances can be considered mitigating circumstances.
 
 
 38
 1. Inadequate or insufficient psychiatric help.
 
 
 39
 2. Love/hate relationship with father/mother.3. Daily extreme mental and physical abuse by father, also witness to daily physical abuse to mother and siblings.
 
 
 40
 4. Religious extremes confused defendant.
 
 
 41
 5. Confusing sexual mores at home (incest), with mother condoning or aware of incest/abuse.
 
 
 42
 6. Accused of death of favorite sister.
 
 
 43
 7. Stress of divorce from family.
 
 
 44
 8. Rejection of mother's love during teen years.
 
 
 45
 Thank you.
 
 
 46
 In a hearing outside the presence of the jury, the state trial court stated:
 
 
 47
 I feel I cannot say anything in light of the sentence which indicates which way they are voting, and anything I say at this particular time will be coercive.
 
 
 48
 ...
 
 
 49
 They are asking me to interpret the evidence; something I cannot do.
 
 
 50
 Counsel for McDowell's position was, "in my judgment the question could be answered; that the mitigating--or the circumstances, the circumstances named, are proper circumstances."
 
 
 51
 The state trial court responded to the jury's question:
 
 
 52
 You're asking me, in essence, to decide the case for you. You have been instructed as to the law and I hate to throw you out like this.
 
 
 53
 But if you go back and read the instructions, in particular you have one instruction in which the mitigating and aggravating factors are listed.
 
 
 54
 Then you have another instruction, the concluding instruction which reads as follows:
 
 
 55
 "One mitigating circumstance may outweigh several aggravating circumstances or one aggravating circumstance may outweigh several mitigating circumstances. You shall give each the weight to which you find it to be entitled."
 
 
 56
 Those are the two instructions that I think really apply. I would ask you to go back, reread those instructions....
 
 
 57
 The jury resumed deliberations on Friday afternoon and, after a weekend break, returned a verdict of death.
 
 
 58
 The jury's question can be interpreted to mean that, at the time the jury wrote it, eleven jurors were confused and mistakenly thought they could not consider the eight instances of McDowell's background as mitigating evidence. This confusion, McDowell argues, was not dispelled by the state trial court's response, and as a result he was denied a fair trial and is entitled to federal habeas relief.
 
 
 59
 To obtain federal habeas relief, McDowell must demonstrate that any inadequacy in the instructions violated his federal constitutional rights. Thompson, 86 F.3d at 1521 (stating "Giving an instruction inadequate by direct appeal standards does not necessarily result in habeas relief from a state court conviction."); see also Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).
 
 
 60
 McDowell clearly has a constitutional right to have the jury consider any mitigating evidence he presents. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978). Although the jury determines the appropriate weight to be given to the mitigating evidence, the jury "may not give it no weight by excluding such evidence from their consideration." Eddings, 455 U.S. at 114-15, 102 S.Ct. at 877.
 
 
 61
 Our inquiry, however, is not whether the jury was confused at the time they wrote the question, but whether the state trial court adequately responded to their inquiry and dispelled any confusion they might have had. When a jury expresses confusion, the state trial court must respond with "sufficient specificity to clarify the jury's problem." Davis v. Greer, 675 F.2d 141, 145 (7th Cir.) (citing Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946)), cert. denied, 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982). The state trial court must clear away with "concrete accuracy" the jury's misunderstanding that it cannot consider the mitigating evidence. See Bollenbach, 326 U.S. at 612-13, 66 S.Ct. at 405.
 
 
 62
 The state trial court's original instructions correctly instructed the jury that they could consider all the mitigating evidence presented by McDowell. In the original instructions, the state trial court listed the aggravating and mitigating factors under California Penal Code Section 190.3 and stated the jury "shall" consider those factors. One of the factors was:
 
 
 63
 Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or personal history that the defendant offers as a basis for a sentence less than death.
 
 
 64
 The state trial court referred the jury to this instruction in response to the jury's question, and instructed the jury to read it. This instruction was directly responsive to the jury's question and correctly told the jury that they could consider as mitigating evidence anything in McDowell's background.
 
 
 65
 McDowell argues this was not good enough. He contends the state trial court should have given the jury supplemental instructions, instructions framed in some different language which would have informed the jury that each of the eight factors listed in the jury's question could be considered as a mitigating circumstance and that each factor should be given whatever weight the jury deemed appropriate.
 
 
 66
 The state trial court could have elaborated and answered the jury's question in this fashion, but the Constitution does not require the court to give the best available answer. We have approved a practice of referring the jury to the original instructions when those instructions correctly answer the jury's question. United States v. Collom, 614 F.2d 624, 631 (9th Cir.1979), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). We cannot assume the jury remained confused after the state trial court specifically told them to read the particular original instruction which told them in no uncertain terms that they could consider any evidence of McDowell's background as mitigating evidence.[5]
 
 
 67
 The state trial court's response to the jury's question was sufficient to dispel any confusion they might have had.
 
 
 68
 D. Ineffective Assistance of Counsel--Penalty Phase
 
 
 69
 McDowell argues Gillingham rendered ineffective assistance at the penalty phase because Gillingham (1) failed to call a mental health expert as a witness; (2) failed to present mitigating evidence of McDowell's sexual abuse as a child and his chronic substance and alcohol abuse; and (3) during closing argument, Gillingham failed to adequately argue the mitigating effect of McDowell's background. These arguments lack merit.
 
 
 70
 McDowell must demonstrate that Gillingham's representation was constitutionally deficient and that prejudice resulted. Strickland, 466 U.S. at 688, 104 S.Ct. at 2064-65. For penalty phase claims, the prejudice prong requires McDowell to establish that, absent the errors, "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. at 2069; see also Hendricks, 70 F.3d at 1036-37.
 
 1. Mental Health Expert
 
 71
 Gillingham retained three mental health experts: Doctor Vicary, a forensic psychiatrist; Doctor Maloney, a clinical psychologist; and Doctor Murphy, a psychologist with an expertise in homosexuality. Doctor Murphy interviewed McDowell on two occasions and prepared a report which revealed extremely damaging information about McDowell. The report revealed an obsession with rape and violence against women, "masochistic overtones to his homosexual activity," and a lack of remorse or acceptance of responsibility for his behavior. For example, in the report Dr. Murphy stated:
 
 
 72
 When asked about obsessive thoughts, he mentioned he was always obsessed with having sex with young boys.... Another obsession related to rape of women.... His most prominent sexual fantasy is as follows:
 
 
 73
 He finds a woman and brings her to a house he has built. The house has a labyrinth of dungeons, in which there are five dungeons one being enclosed in another. He places his female victims in the dungeons progressively and when he reaches the last dungeon, he not only rapes the woman, but then either slits her throat or strangles her to death.
 
 
 74
 He indicated he saw himself as the "lowest scum on earth" then a few minutes later was berating inmates who thought they were so good and said he was as "good as any of them."
 
 
 75
 ...
 
 
 76
 [McDowell] is fascinated by WW II and wishes he had lived in that period. He is particularly interested in the Nazi concentration camps and the sadistic treatment of prisoners.
 
 
 77
 ...
 
 
 78
 He opined that he may have gotten drunk and thought about the [Rodriguez] murder as a punishment for [his lover's] lack of recognition [of his work] and the argument between them.
 
 
 79
 ...
 
 
 80
 When asked about his previous incarcerations and institutionalizations, he indicated he was able to manipulate mental health practitioners to think what he wanted.
 
 
 81
 ...
 
 
 82
 He reported uncontrollable rages when married that were usually caused by alcohol intoxication. He stated his wife had him arrested and at the same time a broad smile came across his face.
 
 
 83
 Doctor Murphy distributed his report to Gillingham, Doctor Maloney, and Doctor Vicary. During the evidentiary hearing before the district court, Gillingham testified that he met with Doctor Vicary during the guilt phase of the trial and, at that time, recalled that Doctor Vicary had received a copy of Doctor Murphy's report. Gillingham then decided not to call Doctor Vicary or any other mental health expert during the penalty phase and did not retain another mental health expert.
 
 
 84
 Gillingham's decision not to call Doctor Vicary as an expert or to call another mental health expert clearly was a strategic decision. Had Gillingham called Doctor Vicary, the prosecution likely would have elicited the extremely damaging information in the Murphy report. If Gillingham retained another expert, it would have been difficult not to reveal the information within the Murphy report to the new expert. If Gillingham did not provide the Murphy report to a newly retained expert, the new expert would have been compelled to testify that he or she did not receive all the reports and there was a missing report. Further, if Gillingham called an expert witness, the prosecution certainly would have called its own expert and no doubt would have requested an examination of McDowell by its expert.
 
 
 85
 There was also a reasonable likelihood that a new expert would obtain comparable or other damaging information from interviewing McDowell. Indeed, Doctor Maloney's report also is very damaging. In his report, Doctor Maloney states: "adults with [McDowell's] profile may report behavior characterized by poorly socialized aggression, authority conflicts, unexpected violent outbursts and ... the extreme by such acts as unprovoked bar knifings, 'Manson type' killings and bizarre sado-masochistic sexuality."
 
 
 86
 Moreover, to date, no expert has opined that McDowell suffers from a mental impairment which likely would elicit sympathy from the jury in light of the overwhelming aggravating evidence. In his report, Doctor Maloney states:
 
 
 87
 It appears that his father was abusive, but it also appears that [McDowell] may attribute a number of problems to his father that are only tenuously connected.
 
 
 88
 ...
 
 
 89
 [H]is mental status is essentially normal.
 
 
 90
 ...
 
 
 91
 His overall pattern of performance is not suggestive of an individual who has any significant emotional disturbance, such as a functional psychosis or organic brain syndrome.
 
 
 92
 ...
 
 
 93
 There is some suggestion that he may have been exaggerating his psychological problems.
 
 
 94
 ...
 
 
 95
 Most persons with similar profiles are considered to straddle the fence between a personality disorder and psychosis.
 
 
 96
 ...
 
 
 97
 Present data do suggest that Mr. McDowell has a serious emotional disturbance. It does not appear to be a psychotic-like disturbance, in the sense that his thinking processes are generally intact and there is no suggestion of any obvious disruption in his ability to perceive reality.
 
 
 98
 We conclude Gillingham did not render deficient assistance by choosing not to call an expert witness. However, even if we were to assume Gillingham's performance was deficient, McDowell has not demonstrated prejudice.
 
 
 99
 McDowell argues that Gillingham should have called Doctor Vicary as an expert witness because he would have "tied up" the mitigating evidence and would have explained to the jury how McDowell's violent conduct was caused by his sexual abuse as a minor. In a declaration submitted in support of McDowell's habeas petition, Doctor Vicary states he would have testified as follows:
 
 
 100
 I had formed the opinion generally that Mr. McDowell's personal background was literally traumatic, and had left him clinically psychologically disturbed.
 
 
 101
 ...
 
 
 102
 I would also have sought to tie together all of the evidence ... obtained ... in an effort to explain Mr. McDowell's personal history and mental condition to the jury. Thus I would have sought to explain to the jury the relationship, psychologically and behaviorally, between Mr. McDowell's personal background and his criminal acts--what it is that makes the various aspects of Mr. McDowell's tragic and abusive personal history mitigating circumstances. In this regard I would have explained to the jury that the nature of his criminal conduct is consistent with and explained by his personal history of enduring and witnessing physical and sexual abuse, and by his chronic and acute substance abuse.
 
 
 103
 This evidence is far from compelling. Indeed, it offers little to combat the overwhelming aggravating circumstances. "[W]here the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence." Bonin, 59 F.3d at 836. Further, there is a negative risk associated with presenting a defense based on mental incapacity, and expert testimony is not a panacea for damaging aggravating evidence. See id. at 834-35.
 
 
 104
 McDowell has not shown prejudice. He has not demonstrated a reasonable probability that the introduction of Doctor Vicary's proposed testimony or other expert testimony would have changed the jury's sentencing decision. See id. at 836.
 
 2. Mitigating Evidence Not Introduced
 
 105
 McDowell next contends Gillingham rendered ineffective assistance by not presenting available mitigating evidence relating to his background.
 
 
 106
 McDowell's defense during the penalty phase focused on his father's physical and psychological abuse of him throughout his childhood. McDowell presented evidence that he suffered severe beatings, on a daily basis, from the time he was only weeks old. His maternal uncles testified that McDowell's father beat him severely on a daily basis. His brother also testified that his father beat McDowell severely, including beating him with a two-by-four. A former neighbor testified that McDowell's father severely beat McDowell and his brother and that she witnessed McDowell's frequent bruises. Finally, his mother testified that McDowell's father beat him daily, starting when he was three weeks old, and blamed him for the death of his sister. She testified that on one occasion his father held him over a fire and beat him to the point of needing an operation. She testified she was not close to McDowell because of her belief that he was a homosexual.
 
 
 107
 Although Gillingham presented the foregoing evidence of physical abuse, he did not present evidence of the sexual abuse McDowell suffered from his uncle and other relatives or of his history of substance and alcohol abuse. The district court determined that, by failing to present such evidence, Gillingham's performance was not deficient. We agree.
 
 
 108
 As correctly found by the district court, Gillingham expended considerable effort in investigating McDowell's background and was prepared to present further mitigating evidence. However, as found by the district court, a conflict over strategy during the penalty phase arose between McDowell and his lawyer, Gillingham.
 
 
 109
 After the state trial court continued the penalty phase over the weekend to allow Gillingham to confer with McDowell and his family members, Gillingham told the court that disagreement continued between him and McDowell. McDowell told the state trial court:
 
 
 110
 There are witnesses that we have that I have no discrepancies about, but there are some I would rather he not bring on for the fact that it will bring--or open old wounds that are not necessary to be opened regardless to what the consequences of myself is.
 
 
 111
 I don't feel that these witnesses can help me. They can only hurt myself and my family. And these witnesses, I might add, are a part of my family.
 
 
 112
 There are two witnesses I don't mind bringing in and questioning and whatever, but the rest of them, as far as my family is concerned, I would rather they not be brought in.
 
 
 113
 After the testimony of the first defense witness, Marshall Brakefield, a maternal uncle, Gillingham explained at a sidebar conference that McDowell asked to be excused and "He was opposed to all of this. I have just asked him if he could deal with it at least up until his mother. He thinks he can." The next morning, Gillingham informed the court that the bailiff had discussed shackling McDowell due to his agitation.
 
 
 114
 As found by the district court, Gillingham did not present further mitigating evidence because he "was forced to balance his obligations as an advocate with his client's strongly held views as to the manner in which to present the defense." Even in light of McDowell's objections, Gillingham was successful in presenting a substantial amount of mitigating evidence of physical abuse. Gillingham cannot be faulted for failing to present further mitigating evidence, much of which would have been cumulative.
 
 
 115
 However, even if we were to assume Gillingham's performance was deficient because he failed to introduce additional evidence of abuse, including sexual abuse and substance abuse, McDowell has not demonstrated prejudice. The jury chose a sentence of death after hearing evidence of McDowell's tragic childhood and the severe physical abuse he suffered. In light of this mitigating evidence and the overwhelming aggravating circumstances, McDowell has not demonstrated a reasonable probability that had Gillingham introduced more evidence of abuse, McDowell's sexual abuse and substance abuse, the jury would have chosen a different sentence. See id.
 
 3. Closing Argument
 
 116
 McDowell contends Gillingham rendered ineffective assistance during his closing argument in the penalty phase. McDowell argues Gillingham's closing argument was ineffective because he did not specifically state that the catch-all factor of California Penal Code Section 190.3(k) allowed the jury to consider any evidence of McDowell's background as mitigating circumstances.[6]
 
 
 117
 Gillingham's choice not to specifically relate the evidence to the statutory factors was clearly a strategic choice. In his closing argument, Gillingham was not formalistic and did not use a mathematical approach in arguing how the jury should analyze and balance the aggravating factors and mitigating circumstances. Instead, he spoke to the jury in laypersons' terms and pleaded mercy for McDowell. Gillingham reminded the jury of the magnitude of their decision and asked the jury not to be vengeful by substituting one death for another. He explained that he was amazed that the victim's husband could come to court and testify without rage, hate, or anger and impliedly asked the same from the jurors. He also gave statistics on the death penalty and argued that the killing of one person "does not necessarily stop killing by another person." Finally, he referred to McDowell's abusive childhood background and asserted that "McDowell is like cast from a mold, or having lived in a vice, and the clamp marks are there and they were created basically in the image and likeness of his father."
 
 
 118
 Faulting Gillingham for failing to link the mitigating evidence to specific statutory factors "would probably narrow the boundaries of acceptable argument style too much." Hendricks, 70 F.3d at 1045. Gillingham was not constitutionally required to specifically tell the jury they could consider the mitigating evidence under section 190.3(k). The trial court told them this in its instructions. See supra.
 
 E. Prosecutorial Misconduct
 
 119
 McDowell argues the prosecutor committed prosecutorial misconduct by (1) arguing that the absence of particular mitigating circumstances constituted aggravating factors, (2) arguing that the presence of Rodriguez's two-year old child in the house at the time of the murder constituted an aggravating factor, (3) commenting on McDowell's demeanor during trial, and (4) eliciting inadmissible testimony. We reject these arguments.
 
 1. Absence of Mitigating Circumstances
 
 120
 During closing arguments in the penalty phase, the prosecutor argued that the jury could consider the absence of evidence applicable to mitigating factors (d) and (h) under California Penal Code Section 190.3 as evidence of aggravation. Factor (d) provides that, in reaching its sentencing decision, the jury may consider: "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Factor (h) provides that the jury may consider: "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication."
 
 
 121
 During closing argument, the prosecutor made the following statements:
 
 
 122
 Another category or factor that you can consider and then give the appropriate weight to is ... "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."
 
 
 123
 I submit to you that there is absolutely no evidence Mr. McDowell was under the influence of extreme mental or emotional disturbance.
 
 
 124
 It is People's contention that the fact that there was no influence of a strain, mental or emotional disturbance, is a factor in aggravation, and you should give it the proper weight.
 
 
 125
 ...
 
 
 126
 [With respect to factor (h) ], [w]ell if Mr. McDowell was able to do it, what he did, ... with no evidence of intoxication ... then you know that it didn't exist.
 
 
 127
 And I submit to you that this is a factor in aggravation because it tells you the degree to which Mr. McDowell planned out and foresaw and designed a scheme to meet his sexual urgings on May 20th, 1992.
 
 
 128
 The prosecutor properly could have argued that there was no evidence of mental impairment or intoxication and the jury could consider this lack of evidence. Cf. Tuilaepa v. California, 512 U.S. 967, 975-81, 114 S.Ct. 2630, 2637-39, 129 L.Ed.2d 750 (1994). The prosecutor could not argue, however, that under California law this lack of evidence constituted a positive aggravating factor. See People v. Davenport, 41 Cal.3d 247, 221 Cal.Rptr. 794, 710 P.2d 861 (1985).
 
 
 129
 Nevertheless, in the present case, the California Supreme Court determined any error was harmless. McDowell, 250 Cal.Rptr. 530, 763 P.2d at 1281. We agree with the California Supreme Court: there is not a reasonable possibility that the argument affected the verdict. Both Gillingham and the state trial court guarded against this.
 
 
 130
 During his closing argument, Gillingham told the jury the prosecutor had improperly converted a mitigating factor into an aggravating factor. He also told the jury they could not consider the absence of a mitigating factor as an aggravating factor. Even the prosecutor stressed to the jury that they were not simply to add up the number of aggravating and mitigating factors to determine the appropriate sentence, and the state trial court instructed the jury that they were to give whatever weight to the factors they deemed appropriate and that one mitigating circumstance could outweigh several aggravating circumstances.[7]
 
 2. Presence of Rodriguez's Child
 
 131
 McDowell also asserts the prosecutor improperly argued during his closing argument in the penalty phase that McDowell chose Rodriguez as a victim because her child was present at the Bardsley home at the time of the rape and murder. McDowell contends there was no evidence that he knew Rodriguez had a child or that the child would be present at the time of the rape and murder.
 
 
 132
 An improper comment made by a prosecutor does not violate a defendant's constitutional rights unless the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Turner v. Marshall, 63 F.3d 807, 817-18 (9th Cir.1995) (internal quotations and citation omitted).
 
 
 133
 The prosecutor's comment did not violate McDowell's due process rights. The comment was a single comment made in the context of other appropriate argument. Moreover, the jury was aware Rodriguez's child was far removed from the scene of the murder and, as asserted by McDowell, there was no evidence McDowell chose his victim because a child was present. It is highly unlikely, particularly in light of the other overwhelming aggravating evidence, that this argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id.
 
 
 134
 3. Comments on McDowell's Demeanor and Tactics
 
 
 135
 McDowell argues that the prosecutor, during his closing argument in the penalty phase, improperly commented on McDowell's demeanor and implied McDowell's mother should not be permitted to plead for his life. The prosecutor likened McDowell to a lion, placid only while caged, and stated that he was well behaved during trial because his fate was being determined. The prosecutor also stated that McDowell had the right to present his mother's plea for his life, but then stated that McDowell did not allow anyone to plead for Rodriguez's life.
 
 
 136
 Even if arguably inflammatory, these statements did not render McDowell's sentencing phase fundamentally unfair. By making the lion comment the prosecution merely asked the jury not to rely on McDowell's passive behavior during trial. With regard to the comment pertaining to McDowell's mother, the prosecutor did not state that the jury could not consider the mother's plea. The prosecutor simply asked the jury not to overlook the victim and not to make its sentencing decision based solely on sympathy for McDowell.
 
 4. Inadmissible Testimony
 
 137
 Finally, McDowell argues the prosecutor committed misconduct during the penalty phase by eliciting inadmissible testimony from Patricia H., an earlier rape victim. Patricia H. testified that, on the day of her rape, McDowell asked her for a glass of tea and asked that she wrap a paper towel around the glass. She testified she asked McDowell if he wanted the towel around the glass "so they can't find your fingerprints." The prosecutor then wanted to ask Patricia H. what McDowell's answer was. This prompted a sidebar conference at which the state trial court ruled Patricia H. could not testify, in response to the prosecutor's question "What did Mr. McDowell say?", that McDowell said he had served enough time in prison. The prosecutor explained that he had told Patricia H. she was not to say that.
 
 
 138
 The prosecutor then asked Patricia H., "What did Mr. McDowell say?" Patricia H. answered "He said, yes, he'd done enough time. He knew all the tricks." The defense objected and the prosecutor explained that he had instructed the witness to testify only that McDowell stated "I know all the tricks."
 
 
 139
 The district court found that the prosecutor did not commit misconduct. He had instructed Patricia H. not to say that McDowell had served time in prison, but she ignored or misunderstood the instruction. We agree with the district court. The prosecutor did not commit misconduct.
 
 
 140
 F. Admission of Conduct Underlying Child Molestation and Patricia H.'s Rape
 
 
 141
 McDowell argues that the introduction, during the penalty phase, of the facts underlying his prior conviction by guilty plea to lewd and lascivious conduct (as a result of a charge of child molestation) and the unadjudicated rape of Patricia H. rendered his sentence fundamentally unfair. We disagree.
 
 
 142
 The introduction of this conduct during the penalty phase of a capital case does not necessarily violate a defendant's rights under the Eighth or Fourteenth Amendments or render a death sentence unreliable. See Williams v. Lynaugh, 814 F.2d 205, 207-08 (5th Cir.), cert. denied, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987); Hatch v. State, 58 F.3d 1447, 1465-66 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); Devier v. Zant, 3 F.3d 1445, 1464-65 (11th Cir.1993), cert. denied, 513 U.S. 1161, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995). A sentencer may rely on criminal conduct not resulting in a conviction if the evidence has "some minimal indicium of reliability beyond mere allegation." United States v. Ibarra, 737 F.2d 825, 827 (9th Cir.1984); see also United States v. Hull, 792 F.2d 941, 942-43 (9th Cir.1986); Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).
 
 
 143
 The evidence of the child molestation was sufficiently reliable. As a consequence of the child molestation charge, McDowell was actually convicted of lewd and lascivious conduct by his guilty plea to that offense. With regard to the rape of Patricia H., although McDowell was not convicted of that offense, an arrest warrant had been issued for his arrest on that charge. He had escaped arrest by fleeing the state of Florida where the rape occurred. That he was wanted for rape in Florida was confirmed by McDowell when he stated at the time of his arrest following the murder: "I'm wanted for rape in Florida." See supra.
 
 
 144
 Further, McDowell's counsel had the opportunity to and did cross-examine the witnesses to test the reliability of their testimony. Curtis M., the victim of the child molestation offense, and his mother testified. To the extent McDowell argues that Curtis M. lied to experts in his deposition that was taken shortly after the molestation, McDowell's counsel had the opportunity to test his credibility during cross-examination. With regard to the rape offense, Patricia H. and her son who was present during her rape also testified.
 
 
 145
 In addition, the state trial court instructed the jury that, before they could consider the evidence of the child molestation and rape offenses, they had to find beyond a reasonable doubt that McDowell had committed those crimes. See People v. Balderas, 41 Cal.3d 144, 222 Cal.Rptr. 184, 711 P.2d 480, 515-16 (1985) (concluding prosecution must prove unadjudicated offenses beyond a reasonable doubt). In these circumstances, the introduction of the evidence of the child molestation and rape did not render the sentencing phase constitutionally unfair. See Williams, 814 F.2d at 207-08.
 
 G. Extrinsic Evidence
 
 146
 McDowell argues the jury considered extrinsic matters in reaching its penalty decision. The district court rejected this argument because the only evidence submitted in support of it was a declaration which was inadmissible under Federal Rule of Evidence 606(b).
 
 
 147
 McDowell submitted the declaration of Connie Jackson Kimble, the holdout juror in McDowell's trial. In her declaration, Kimble stated that the other jurors were becoming increasingly impatient and angry with her. She also stated:
 
 
 148
 One of the jurors ... stated that I should vote for death because a sentence of life without parole would not mean that Mr. McDowell would not be paroled. The juror stressed that if we imposed a sentence of life without parole it wouldn't mean "without parole" and Mr. McDowell could be paroled in 10 or 15 years. The juror also stated that if I voted for death Mr. McDowell would not be executed, because no one was being executed in California. They stressed that if he were sentenced to death he would just remain in prison the rest of his life.
 
 
 149
 She then explained that because McDowell had suffered such a "horrible life," she believed he should not be executed; but she did not want him to be released from custody. She stated she voted for the death sentence because she thought that, notwithstanding the jury's verdict of death, McDowell would not be executed.
 
 
 150
 McDowell first argues that the district court erred by applying Federal Rule of Evidence 606(b) to decide the admissibility of Kimble's declaration. McDowell contends the district court should have applied California Evidence Code Section 1150(a). We disagree.
 
 
 151
 Federal Rule of Evidence 1101(e) provides that the Federal Rules of Evidence apply to habeas corpus petitions filed in federal court under 28 U.S.C. § 2254. Fed.R.Evid. 1101(e). Other Circuits have applied Rule 606(b), rather than state law, when determining whether evidence is admissible to impeach a state court verdict. Bibbins v. Dalsheim, 21 F.3d 13, 16-17 (2d Cir.1994); Stockton v. Commonwealth of Va., 852 F.2d 740, 743-44 (4th Cir.1988); Silagy v. Peters, 905 F.2d 986, 1008-09 (7th Cir.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); see also Bloom v. Vasquez, 840 F.Supp. 1362, 1377 (C.D.Cal.1993). Consistent with the approach taken by our sister circuits, we conclude the district court properly applied the federal law of Rule 606(b).
 
 
 152
 We also conclude the district court did not err by refusing to admit juror Kimble's declaration into evidence. Under Rule 606(b),[8] testimony regarding "extraneous influences" on the jury is admissible, but testimony regarding the deliberative process, the "motives of individual jurors and conduct during deliberations" is inadmissible. United States v. Falsia, 724 F.2d 1339, 1343 (9th Cir.1983); United States v. Bagnariol, 665 F.2d 877, 884-85 (9th Cir.1981), cert. denied, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). "The type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room." Hard v. Burlington N.R.R. Co., 870 F.2d 1454, 1461 (9th Cir.1989).
 
 
 153
 The Seventh Circuit has concluded that identical proffered testimony regarding the consequences of a life or death sentence was inadmissible under Rule 606(b). Silagy v. Peters, 905 F.2d 986, 1008-09 (7th Cir.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In Silagy, the court reasoned that admitting such evidence would authorize "constant attempts to undermine jury verdicts through the scrutiny of the juror's thoughts and deliberations." Id. at 1009.
 
 
 154
 Juror Kimble's declaration reflects her belief about the consequences of the sentence of death and her motive in voting for it. The district court did not err by excluding her declaration.
 
 H. Cumulative Effect
 
 155
 Finally, McDowell argues that the cumulative effect of the alleged errors deprived him of due process.
 
 
 156
 Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial. Kelly v. Stone, 514 F.2d 18, 19 (9th Cir.1975); Walker v. Engle, 703 F.2d 959, 963 (6th Cir.), cert. denied, 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983). That is not the case here. McDowell has not shown the cumulative effect of any alleged errors deprived him of due process.
 
 
 157
 AFFIRMED.
 
 
 
 [1]
 We do not apply in this appeal the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996) ("the Act"). We have held that Chapter 153 of the Act does "not apply to cases filed in the federal courts of this Circuit prior to the Act's effective date of April 24, 1996." Jeffries v. Wood, 103 F.3d 827 (9th Cir.1996). The State concedes that in this case Chapter 154 is inapplicable. Moreover, because nothing in the Act benefits McDowell, and we affirm the denial of McDowell's habeas petition without reference to the Act, there is no point in considering it in this case
 
 
 [2]
 In this opinion, "intoxication" refers to being under the influence of alcohol and/or controlled substances
 
 
 [3]
 The sample was taken approximately seven hours after the murder. Experts for McDowell and the State agreed the average burn-off rate would be .02 per hour. Using this burn-off rate, McDowell's blood alcohol level at the time of the murder would have been approximately .151
 
 
 [4]
 For example, McDowell's counsel argued:
 May 20th, mid afternoon, clad in shorts only, no automobile available for pre-planned escape, no disguise or calculated change of appearance.
 ...
 He went over there to kill her, and he took the cigarettes, he took the lighter? I don't think so. I don't think so.
 ...
 Let's focus on Mr. McDowell's actions after. Are they consistent with anything other than confusion and frenzy? Are there signs of calculation and plan? The open door as he returns to D'Crenza's leaving it open.
 The knife tossed on the floor apparently or dropped right in plain sight in the kitchen.
 The shorts draped over the faucet in the bathroom. The towel thrown on the floor. It's in evidence also.
 The tape that was grabbed with the bloody hand. Still shirtless, he leaves.
 The actions of something or someone involved in something that went wrong. A trail of blood and evidence leading to his arrest; and on that trail is he running? Is he sneaking?
 
 
 [5]
 Juror Connie Jackson Kimble, the holdout juror, has submitted a declaration in which she states that the state trial court's response did not "help us in resolving our dispute" and that another juror told her that the factors she was focusing on "were not relevant and that they were inconsistent with the instructions." This evidence is not admissible to impeach the verdict. Fed.R.Evid. 606(b); Hard v. Burlington N.R.R. Co., 870 F.2d 1454, 1460 (9th Cir.1989); Walker v. United States, 298 F.2d 217, 226 (9th Cir.1962)
 
 
 [6]
 As instructed by the state trial court, this statutory catch-all factor provided that the jury could consider in mitigation any evidence of McDowell's "character or personal history" which "extenuates the gravity of the crime." See Cal.Pen.Code 190.3(k)
 
 
 [7]
 We assume only for the purpose of this analysis that it could be an error of federal constitutional dimension for the prosecutor to argue that the absence of a mitigating factor can be considered by the jury as an aggravating factor in a capital case. We do not decide this question, however, and express no opinion on it
 
 
 [8]
 Rule 606(b) provides:
 Upon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
 Fed.R.Evid. 606(b).